IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2009

**STATE OF TENNESSEE v. TOMMIE SIMMONS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08054    W. Mark Ward, Judge**

_____

**No. W2008-00942-CCA-R3-CD  - Filed May 8, 2009**
_____

The defendant, Tommie Simmons, was convicted by a Shelby County jury of two counts of robbery, a Class C felony, and sentenced by the trial court as a Range I offender to concurrent terms of three years and six months, with six months to serve followed by supervised probation. In a timely appeal to this court, the defendant challenges the sufficiency of the convicting evidence and argues that the trial court erred by denying judicial diversion. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Scottie O. Wilkes, Memphis, Tennessee, for the appellant, Tommie Simmons.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert and Summer Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At approximately 11:30 p.m. or 12:00 a.m. on May 18-19, 2006, Michael Peters and his wife, Nadia Wasiullah-Peters, and Jonathan Bawcum and his wife, Desiree Bawcum, were walking in downtown Memphis when they were accosted by four men, one of whom appeared to be holding a gun under his shirt and demanded the women's purses. One man grabbed Mrs. Wasiullah-Peters' purse, while a second man grabbed Mrs. Bawcum's purse. All four men then fled on foot. Based in part on the victims' identifications, the Shelby County Grand Jury returned an indictment charging the defendant and two codefendants, Jeremy Harwell and Neil Thompson, with two counts of robbery each.

## Trial

## State's Proof

The defendant and his two codefendants were tried jointly before a Shelby County Criminal Court jury on February 4-8, 2008. The State's first witness, Karl Michael Peters, testified as follows. On the night of May 18, 2006, he and his wife were walking with the Bawcums down Fourth Street toward Madison Avenue when he noticed four young African-American men approaching the street on foot from a cross alley. He and Mr. Bawcum were walking a few feet ahead of their wives when he heard a noise, turned around, and saw that two of the men were standing next to each other on the sidewalk, approximately an arm's length from the women. The other two men were standing in the street and appeared to be "keeping a lookout." One of the two men on the sidewalk, who had his arm under his shirt suggestive of a gun, said to the women, "[Y]ou know what time it is," and demanded their purses. Mrs. Bawcum relinquished her purse to the second man on the sidewalk, who "kind of snatched" it from her, and the first man then ripped Mrs. Wasiullah-Peters' purse off her shoulder.

All four men ran down Madison Avenue before taking a cut-through beside a school. Mr. Peters followed at a distance, watching as two of the men stopped in the cut-through, emptied Mrs. Bawcum's purse on the ground, picked up the valuables, and then continued toward Court Avenue. After pausing to retrieve the discarded purse and contents, Mr. Peters continued his cautious pursuit, following all four men until one of them broke off from the main group, and then following the three who stayed together until he lost sight of them near a park. At that point, he telephoned Mr. Bawcum, who was riding in a squad car with a police officer, and they picked him up and drove around the area searching for the suspects. During their search, they spotted a group of men walking together, with one of the men wearing a yellow shirt of the same color worn by one of the robbers. However, after investigating, the police officer informed them that the man was not one of the robbers.

Mr. Peters further testified as follows. The area where the robbery occurred was well-lit, and the robbers were only four or five feet from him. Consequently, he was able to get a good look at them, including their faces. He also got a good look at one of the two robbers who acted as look-out. The robber who implied he had a gun wore a black shirt with green skulls on it and a white "Doo-rag" or hat; the robber who took Mrs. Bawcum's purse was disheveled-looking and wore his hair in unkept braids; and the robber who acted as look-out was roughly six feet tall with short hair and distinctive ears that "kind of pointed forward a little bit." On May 30, 2006, Peters and his wife went to the robbery office to be interviewed and shown photographic lineups of possible suspects. At that time, he identified Harwell as the robber who implied he had a gun. On June 13, 2006, he and his wife returned downtown and he was shown three more photographic arrays, from which he positively identified the defendant and Thompson. He was unable to make an identification from the third photographic array.

Mr. Peters made positive courtroom identifications of the defendant as the man who ripped his wife's purse from her shoulder and Harwell as the man who took Mrs. Bawcum's purse, and said that he had previously recognized them in a crowd of people at the preliminary hearing. In contrast

to his earlier testimony, however, he indicated that the man who implied he had a weapon was different from the one who ripped his wife's purse off her shoulder.

On cross-examination, Mr. Peters testified that the entire robbery took approximately ten to fifteen seconds. He conceded that he described the robbers on the night of the incident in general terms as 18 to 20 years old, approximately six feet tall, with medium to dark complexions and wearing baggy clothing. He testified that only one robber implied he had a gun and agreed that he had been mistaken when he indicated on the photographic arrays that both Harwell and the defendant implied they had guns. Finally, he acknowledged that he had given somewhat confusing and conflicting testimony with respect to which robber had taken his wife's purse:

Q. Another thing that confused me, today it appears you really don't know who took [your wife's] purse?

A. No. I still believe it to be this gentleman who took Nadia's purse.

Q. Although you said on direct testimony it was the other gentleman?

A. I think actually I've said both throughout this whole thing. I think while I've been looking at the pictures, I mean, I know who did it by looking at the pictures, but in the course of questioning, it's just become somewhat confusing.

Nadia Wasiullah-Peters testified that she, her husband, and their friends were returning to their vehicle at approximately 11:45 p.m. when four African-American men walked out of an alley behind them. One of the men asked what time it was, and Mr. Bawcum answered him. The four men then began following them down the street, coming increasingly closer. One of them asked again what time it was, and when she turned around, one of the men, who was holding his arm under his shirt suggestive of a gun, demanded their money. That man, whom she later identified as Harwell, took Mrs. Bawcum's purse, while a second one, whom she later identified as the defendant, grabbed her purse. The witness testified that she held the $434 Louis Vuitton purse clasped tightly to her chest because she did not want to lose it. The strap on the purse broke, however, and the defendant ran off with his three companions, carrying the purse with him.

Mrs. Wasiullah-Peters testified that she got a good look at the two men who took the purses. She described the defendant as dressed in a hat with braids hanging below the hat, baggy pants, and a black shirt with green "ghost [fa]ces" on it. She said that Harwell was nicely dressed in normal-fitting jeans, a blue and white striped button-down shirt and white t-shirt, and a "Doo-rag" and hat worn backwards. She stated that she did not get a good look at the other two men, who were wearing baggy pants or jeans and oversized shirts.

Mrs. Wasiullah-Peters testified that she and her husband went downtown twice to talk to a police detective and view photographs of suspects. She stated that she identified the defendant and Harwell from the photographic spreadsheets she was shown but was unable to identify the other two men involved in the robbery. She and the detective were the only two people present during the identification procedures and she and her husband did not discuss their respective identifications

with each other. She made positive courtroom identifications of the defendant as the man who had ripped her purse from her shoulder and Harwell as the man who had taken Mrs. Bawcum's purse after implying he had a gun.

On cross-examination, Mrs. Wasiullah-Peters estimated that the entire ordeal lasted approximately a minute and a half to two minutes. She admitted that she never saw a gun but said that Harwell had something pointed at them under his shirt that appeared to be a gun. She stated that she looked directly at the defendant's face as he pulled the purse from her and that he yanked on her purse for at least thirty seconds before the strap broke.

Sergeant Joseph Pearlman of the Memphis Police Department testified that on June 7, 2006, he showed Jonathan Bawcum three photographic spreadsheets, from which he identified one individual, circling his photograph and writing that he was the one who "presented a gun under his shirt and . . . took Desiree's purse." He said he also showed Karl Michael Peters three spreadsheets on June 13, 2006. From them, Peters identified two individuals involved in the robbery.

Desiree Bawcum testified that as she, her husband, and their friends were walking she heard a noise, turned, and saw four young African-American men coming out of a parking garage on the opposite side of the street. The next thing she knew, one of the men was in front of her, another was beside Mrs. Wasiullah-Peters, and two others were in the street. The one in front of her, who was pointing something at her under his shirt, said, "[Y]ou know what time it is," which she interpreted to mean that it was time to give up her purse. He snatched her purse from her arm, causing her to spill her soda, while the second man wrested Mrs. Wasiullah-Peters' purse from her tight clasp by breaking the strap.

Mrs. Bawcum testified that the area was well-lit by stadium and street lights and that she got a good look at the robbers who snatched the purses, as well as one of the two men who stood in the street. On June 7, 2006, a police officer showed her three separate spreadsheets, each containing six photographs, from which she identified three of the men involved in the robbery. She later returned to look at a fourth spreadsheet, but was unable to identify anyone on it. Mrs. Bawcum made positive courtroom identifications of Harwell as the man who took Mrs. Wasiullah-Peters's purse, Thompson as one of the men who acted as lookout, and the defendant as the man who implied he had a gun and took her purse. On cross-examination, she testified that the incident lasted only about one minute. She acknowledged that, immediately after the robbery, she provided only general descriptions of the robbers as young men approximately six feet tall with medium complexions and wearing baggy jeans.

Jonathan Bawcum testified as follows. He, his wife, and their friends were returning to their vehicle at approximately midnight on May 19, 2006, when they saw four men come out of an alley to their right. They kept walking, and two of the men walked up behind them. One of the two had a gun under his shirt and said, "[Y]ou know what time it is," before snatching Mrs. Bawcum's purse and running off with the other men. The area was well-lit, and he got a good look at the man who snatched his wife's purse. Later that same day, he obtained his wife's cell phone records, called a number that had been dialed that morning on the stolen phone, and spoke with a man who identified himself as "Jeremy Harwell," but grew silent and ended the call when he asked what he knew about

the robbery. Mr. Bawcum then received a call back from a woman who identified herself as Harwell's mother and told him that Harwell did not have anything to do with the robbery.

Mr. Bawcum testified that he reported the telephone conversations to the police. Several weeks later, he and his wife went downtown and were separately shown some photographic spreadsheets. Mr. Bawcum said he was able to make a positive identification from one spreadsheet, identifying Harwell as the man who stole his wife's purse. He positively identified Harwell in the courtroom as well, testifying that he was the man who presented the gun under his shirt and took his wife's purse.

Detective Robert Scoggins of the Memphis Police Department, who was assigned to investigate the case, described the photographic lineup procedure employed with the victims, including the manner in which they were separated and shown the lineups individually. He said that he interviewed Harwell in the robbery office on June 8, 2006, and that Harwell denied any involvement in the robbery. About fifteen minutes into the interview, a man named Willie Beadle came into the robbery office and told him that "some dude on the street" had given Beadle Mrs. Bawcum's cell phone. Detective Scoggins stated that Beadle left the office before he had a chance to speak further with him. He later compiled a lineup containing Beadle's photograph, which he showed to the victims, but none of the victims was able to make any identification from it.

**Defense Proof**

The defendant denied any involvement in the robbery, testifying that on the day in question he worked in Germantown until late in the evening with his father in their lawn service business before returning home at 10:45 p.m. He identified phone records, subsequently introduced into evidence, which he claimed showed that he made a twenty-five-second phone call from his father's land line to his girlfriend's cell phone on May 18, 2006, at 11:39 p.m. On cross-examination, he acknowledged that the phone records showed that a series of phone calls were made from his house phone to his girlfriend's cell phone during the day and evening while he was still at work. He suggested that the calls could have been made by one of his sisters, who was friends with his girlfriend.

Harwell's mother, Bessie Harwell, testified on Harwell's behalf that she spoke to her son shortly after 11:00 p.m. on May 18, 2006, while he was down the street at Audra Johnson's house. Harwell's sister, Eureka Michelle Harwell, testified that she dropped Harwell off at Johnson's home at 10:30 or 10:35 p.m. on May 18, 2006, and Audra Johnson, Harwell's girlfriend, testified that Harwell came to her house at about 10:30 or 10:35 p.m. and stayed the rest of the night.

Willie Beadle testified that he was at the home of his baby's mother, Alicia Hawkins, at approximately 1:00 a.m. on May 19, 2006, when her brothers, Eric Hawkins and Terrez Hawkins, accompanied by a third man, Tyrone Mobley, came in with some items they were trying to sell, including a cell phone. He said he took the phone and called Harwell's number to see if it worked, but the answering service "popped straight on" so he gave the phone back. On cross-examination, he acknowledged that he was a close friend of Harwell.

James Lee Walker testified that sometime after midnight on May 19, 2006, he was at Ms. Densanil Hawkins' house when her two sons, Eric and Terrez, came in with a friend carrying a wallet, two cell phones, and other items. He said the Hawkins brothers tried to sell one of the phones to Beadle, and he told him not to use it because it was probably stolen. However, Beadle ignored his advice and dialed Harwell's number on the phone. On cross-examination, he acknowledged that his girlfriend was Harwell's sister and that he had been convicted in 2001 of attempted forgery and theft under $500.

Densanil Hawkins testified that on May 19, 2006, her sons and Tyrone Mobley came home with some items, including a cell phone, which Terrez tried to sell to her. She said she did not buy it because she "knew it was hot." She stated that Willie Beadle and James Walker were present in her home at the time. On cross-examination, however, she indicated that she was not certain of the date, testifying that it was in "May or June." She also acknowledged that the defendant's father was related to her.

The final defense witness was Jeremy Harwell, who testified in his own behalf that he was home asleep with his baby's mother at the time of the robbery and had no involvement in the crime. After deliberating, the jury convicted the defendant and Harwell of two counts of robbery each and Thompson of two counts of facilitation of robbery.

**Sentencing Hearing**

The defendant's father, Tommie Hawkins, Sr., testified that the defendant had lived with him his whole life and was a hard-working young man who had been helping him in his lawn service business since he was five years old. He stated that if the defendant were released on probation, he would ensure that he obtained a full-time job and would help him comply with any other conditions of probation.

The twenty-one-year-old defendant, who had no prior criminal record, testified that he had gone as far as the ninth grade in school and had been planning to take GED classes, but never got the chance because of the instant case. He said he had worked full-time for a temporary labor service before he went to jail and believed that he could return to full-time work there upon his release. He denied any current drug use but admitted he had used marijuana in his teens. He apologized to the victims for "whatever happened to them in this incident" and expressed his willingness to comply with any conditions of probation. Finally, he testified that his ex-girlfriend was expecting his child and said that he intended to stay out of trouble and support the child.

When asked on cross-examination why he told the probation officer who prepared his presentence report that he had never used any alcohol or illegal drugs, he first replied that he told her only that he had never used any alcohol but then said that she asked him only whether he was currently using alcohol or drugs. He said he thought he "got withdrawn" from Mitchell High School in the ninth grade, not the eleventh grade as stated in the presentence report. He said he was withdrawn for missing too many days of school. He later referred to his having been "withdrawn" from school as having been suspended and, still later, as having been expelled and indicated that he thought the terms were interchangeable.

The defendant acknowledged that the brief employment history listed on his presentence report did not start until 2007. He at first implied that he had worked full-time for his father before that time. When pressed, however, he said he had worked only in the evenings because he was a minor and that he had helped his sick mother around the house during the daytime hours. He said he regretted what had happened to the victims but denied that he played any role in the robbery. Upon questioning by the trial court, the defendant testified that he did not think any gun was involved in the robbery. He said that Thompson was his cousin but that he did not know Harwell other than having seen him as they went back and forth to court.

At the conclusion of the sentencing hearing, the trial court found one enhancement factor applicable: that the defendant was a leader in the commission of the offense. See Tenn. Code Ann. § 40-35-114(2) (Supp. 2008). The court found no applicable mitigating factors and sentenced the defendant as a Range I, standard offender to three years and six months, which was six months beyond the minimum sentence in the range. The court found that the defendant was not a suitable candidate for judicial diversion or full probation and therefore imposed a sentence of split confinement, with the defendant ordered to serve six months and the remainder of the time on supervised probation.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the evidence, arguing that there was insufficient proof of his identity as one of the robbers. In support, he cites, among other things, the general descriptions the victims provided of the robbers on the night of the incident; the various inconsistencies in the victims' photographic and courtroom identifications of the perpetrators, as well as the differences in their accounts of the crime; the fact that Mr. Peters and Mr. Bawcum on the night of the robbery pointed out an individual in a yellow shirt as a possible suspect; his own testimony that he was working in Germantown at the time of the robbery; and the testimony offered by other defense witnesses, including Willie Beadle and Densanil Hawkins, which suggested that the Hawkins brothers were the actual perpetrators of the crime. The defendant argues that "the fact that Willie Beadle came to the police on his own and that Densanil Hawkins implicated her sons would strongly suggest [the defendant's] lack of involvement."

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony

of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude that the evidence was more than sufficient to establish the defendant's identity as one of the robbers. Mrs. Bawcum, Mr. Peters, and Mrs. Wasiullah-Peters all unequivocally identified the defendant, both from photo lineups and in the courtroom, as one of the men who robbed the women. Two described the scene of the robbery as well-lit, and all three said they got a good look at the two men who played the major roles in the robbery. While there were some discrepancies in their accounts, particularly with respect to which woman's purse the defendant grabbed and whether he was the robber who presented the gun, they were consistent in identifying him as one of the men who stood on the sidewalk, grabbed a purse, and fled. Moreover, the State succeeded in poking holes in the defendant's alibi and in showing the potential bias of the various defense witnesses who attempted to finger the Hawkins brothers as the perpetrators of the crime. We, therefore, conclude that the evidence was sufficient to sustain the defendant's convictions.

## II. Denial of Judicial Diversion

The defendant also contends that the trial court abused its discretion by denying his request for judicial diversion. Specifically, he argues that by finding that he was less than candid at trial and at sentencing, the trial court improperly held against him "his decision to testify and put on a defense." He asserts that, other than his alleged lack of candor, he met all the conditions to qualify for diversion. The State argues that the trial court's denial of diversion was proper. We agree with the State.

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A) (Supp. 2008). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to a misdemeanor or Class C, D, or E felony; has not been previously convicted of a felony or a Class A misdemeanor; and who is not seeking deferral for a sexual offense, a violation of Tennessee Code Annotated sections 71-6-117 or 71-6-119, or a Class A or B felony. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period

of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court considers (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. Id.

The record reflects that the trial court considered each of the above factors in its determination of whether the defendant should receive judicial diversion. The court noted that the defendant had no prior criminal record and that the circumstances of the offense were not particularly outrageous. The court found, however, that these factors were outweighed by the defendant's lack of candor before the court, poor social history, poor amenability to correction, and the deterrent value to the defendant and the public in denying diversion. The trial court's thorough ruling states in pertinent part:

> With regard to (A)[,] [t]he defendant's amenability to correction[,] I think his lack of candor with the Court both at trial and in the sentencing process reflects adversely on that. (B) The circumstances of the offense, I don't think there's any particular outrageous circumstances. It's a robbery, that's not weighed against him. Defendant's criminal record, he has no criminal record. He was acquitted of a prior robbery, but I can't consider that in any way.
>
> His social history, he dropped out of school apparently in the ninth grade according to his testimony for absolutely no reason whatsoever other than he just didn't want to go to school. Meanwhile the Pre-Sentence Report reflects about one year of employment since he dropped out in the ninth grade, and he's now twenty-one years old. He claims additional employment but I don't believe him, and the report also indicates that he has no alcohol or drug usage and yet he's talking about marijuana usage quite a bit during his teenage years.
>
> I think his history is negative against him. As far as his physical and mental health, that's neutral. The deterrent value to the defendant as well as others[,] I think

-9-

that's [an] important factor in the case. Interest of the public as well as the accused, I'll say that that's neutral.

I guess that one of the biggest problems I have is I find that he basically committed perjury and now he's asking me to put him on diversion, and the rest of his background is not good either, as I talked about his social history, his dropping out of school, his drug usage and his -- and let me say this Pre-Sentence Report talks about one year of employment since the ninth grade, and that's not even verifiable . . . .

So for those reasons I'm going to deny judicial diversion in this matter.

We disagree with the defendant's contention that he was penalized for his decision to testify at trial and at the sentencing hearing. The record clearly reflects that the defendant's testimony consisted of vague, evasive, and conflicting answers, which justified the trial court's finding that the defendant lacked candor before the court. A trial court may appropriately consider a defendant's lack of truthfulness and candor as a basis for its decision to deny diversion. See State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994); Anderson, 857 S.W.2d at 574. Moreover, the trial court clearly stated for the record additional reasons for its decision to deny diversion, including the defendant's poor social and work history. We, therefore, conclude that the trial court did not abuse its discretion in denying the defendant's request for judicial diversion.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE